UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

ERIC WILLIAMS,
LISA WALKER,

                Plaintiffs,

       v.                                Case No. 14-CV-903

CASHCALL, INC.,

                Defendant.

## DECISION AND ORDER

      Western Sky Financial, LLC is a lender that offers high interest loans to consumers. (ECF No. 12-1 at 2.) It is located on the Cheyenne River Sioux Tribe Nation (the Tribe) Reservation in South Dakota and is wholly owned by Tribal member Martin Webb. (ECF No. 12-1 at 2.) Plaintiffs Lisa Walker and Eric Williams are Wisconsin residents who applied for and received consumer loans from Western Sky. (ECF No. 12-1 at 2, 13.) In November 2011, Ms. Walker borrowed $2,525 at an interest rate of 139.12%; in February 2012, Mr. Williams borrowed $1,000 at an interest rate of 233.91%. (ECF No. 12-1 at 2, 13.) After the funds were advanced to plaintiffs, their loans were

sold to WS Funding, LLC and serviced by Defendant CashCall, Inc., a California corporation. (ECF No. 12-1 at 3.)

Plaintiffs brought a class action suit against CashCall in Wisconsin circuit court claiming that CashCall violated Wisconsin's usury law (Wis. Stat. § 138.09) by charging interest rates above 18 percent without first obtaining a license from the Wisconsin Division of Banking. (ECF No. 1-1 at 1-3.) As a result, plaintiffs allege that, pursuant to Wis. Stat. § 425.305, they are not obligated to repay their loans. (ECF No. 1-1 at 3.) CashCall removed the matter to federal court. (ECF No. 1.) In accordance with 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73(b) the parties all consented to the full jurisdiction of a magistrate judge. (ECF Nos. 6, 8.) Now pending before this court is CashCall's motion to dismiss, which pursuant to Fed. R. Civ. P. 12(d) the court has converted to a motion for summary judgment; alternatively, CashCall moves the court to compel arbitration.

CashCall's brief in support of its motion includes two arguments previously rejected by the Seventh Circuit Court of Appeals in *Jackson v. Payday Financial, LLC*, 764 F.3d 765 (2014). Specifically, it argues that the forum selection clause found in plaintiffs' loan agreements mandates that any in-court litigation occur in the courts of the Tribe, and that the tribal exhaustion doctrine requires that plaintiffs, whose claims implicate the jurisdiction of a federally recognized Indian tribe, must first bring suit in Tribal court before they may later challenge the scope of Tribal jurisdiction in federal court.

CashCall states that it includes those arguments "for preservation only." (ECF No. 12 at 18-23.) Consequently, the court will not address those arguments further.

I. MOTION TO COMPEL ARBITRATION

A. Law Applicable to Determining the Enforceability of the Arbitration Clauses

The court must first determine what law governs the determination of the enforceability of the arbitration clauses. Federal jurisdiction over this dispute exists pursuant to the Class Action Fairness Act, which requires minimal diversity of citizenship of the parties. 28 U.S.C. § 1332(d)(2)(A). When federal courts obtain jurisdiction through diversity of citizenship, they ordinarily will apply "the substantive law of the state in which the district court sits, including choice of law rules." *Wachovia Sec. v. Banco Panamericano, Inc.*, 674 F.3d 743, 751 (7th Cir. 2012) (internal citations omitted).

However, an arbitration clause is a type of forum selection clause. *Sherwood v. Marquette Transp. Co.*, 587 F.3d 841, 844 (7th Cir. 2009). To determine the validity of a forum selection clause, the law designated in the contract's choice of law clause is used. *Jackson*, 764 F.3d at 774-75 (citing *Abbott Laboratories v. Takeda Pharmaceutical Co.*, 476 F.3d 421 (7th Cir. 2007)). Here, the loan agreements each contain a choice of law provision stating that "[t]his Loan Agreement is subject solely to the exclusive laws and jurisdiction of the [Tribe], Cheyenne River Indian Reservation." (ECF No. 12-1 at 6, 13.) However, as the defendants conceded in *Jackson*, 764 F.3d at 775, there does not appear

3
Case 2:14-cv-00903-WED   Filed 03/17/15   Page 3 of 20   Document 36

to be any Tribal law addressing the enforceability of forum selection clauses. The parties here have not directed this court to the existence of any such Tribal law. According to the defendants in *Jackson*, when Cheyenne River Indian Tribal law is lacking, Tribal courts will borrow from federal law. *Id.* at 776. Here, the parties appear to concede that this is correct; both CashCall and plaintiffs rely on federal law in discussing the enforceability of the arbitration clauses in the loan agreements. Therefore, the court will apply federal law in determining the enforceability of the arbitration clauses.

B.  **Arbitrability Determination**

As a threshold matter, CashCall contends that the issue of whether Mr. Williams's arbitration clause is enforceable is to be resolved by the arbitrator, not this court,[1] relying upon the Supreme Court's decision in *Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63, 70-71 (2010). In *Rent-A-Center*, in a section of the contract entitled "Arbitration Procedures," the parties agreed that "[t]he Arbitrator…shall have exclusive authority to resolve any dispute relating to the interpretation, applicability, enforceability or formation of this Agreement including, but not limited to any claim that all or any part of this Agreement is void or voidable." *Id.* at 66. Because the plaintiff there did not challenge the validity of the so-called "delegation provision" specifically,

---

[1] The same argument would seem to apply to Ms. Walker's arbitration clause, but perhaps viewing it as a *fait accompli* given the decision in *Jackson*, as discussed below, CashCall does not press the argument as against her agreement.

the Court held that it was valid, leaving any challenge to the validity of the arbitration agreement as a whole for the arbitrator. 561 U.S. at 71-72.

Mr. Williams's loan agreement does not contain a "delegation provision" similar to that in *Rent-A-Center.* Rather, in identifying the types of disputes that are to be resolved by arbitration, a "Dispute" is defined to include, "by way of example and without limitation,…any issue concerning the validity, enforceability, or scope of this loan or the Arbitration agreement." (ECF No. 12-1 at 9.) CashCall argues that this language evidences the parties' agreement that issues of arbitrability are reserved exclusively for the arbitrator. (ECF No. 12 at 10.)

Challenges to the validity of arbitration agreements can be divided into two types. One type challenges specifically the agreement to arbitrate; the other challenges the contract as a whole. *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 444 (2006). If the challenge is specifically to the agreement to arbitrate, the court may proceed to adjudicate it. *Rent-A-Center*, 561 U.S. at 70; *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 403-04 (1967). In opposing CashCall's motion to compel arbitration, Mr. Williams does not challenge the enforceability of the entire loan agreement; rather, he challenges only the enforceability of the specific provision requiring him to arbitrate disputes under the loan agreement. (ECF No. 16 at 8-10.) Included within that challenge, by definition, is a challenge to the requirement that the arbitrator resolve disputes concerning the enforceability of the arbitration agreement. Thus, the court will

5

proceed to address Mr. Williams's challenge to the enforceability of the arbitration provision.

### C. Plaintiffs' Arbitration Clauses

The Federal Arbitration Act ("FAA") guides the enforceability of arbitration agreements by strongly favoring parties' contractual agreements to arbitrate disputes. *Am. Express Co. v. Italian Colors Rest.*, 133 S. Ct. 2304, 2309 (2013). Section 2 of the FAA provides that contractual agreements to arbitrate "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. As a general rule, courts must "rigorously enforce" arbitration clauses according to their terms, including terms that specify with whom the parties choose to arbitrate their disputes and the rules under which that arbitration will be conducted. *Am. Express Co.*, 133 S. Ct. at 2309 (quoting *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 221 (1985)).

As a type of forum selection clause, the presumptive validity of an arbitration clause "can be overcome if the resisting party can show it is 'unreasonable under the circumstances.'" *Jackson*, 764 F.3d at 776 (quoting *M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 10 (1972)). The United States Supreme Court has identified three sets of circumstances that will render a forum selection clause "unreasonable":

> (1) if their incorporation into the contract was the result of fraud, undue influence or overweening bargaining power;

(2) if the selected forum is so "gravely difficult and inconvenient that [the complaining party] will for all practical purposes be deprived of its day in court[]"; or
(3) if enforcement of the clauses would contravene a strong public policy of the forum in which the suit is brought, declared by statute or judicial decision.

*Id.* (quoting *M/S Bremen*, 407 U.S. at 18).

### 1.     Ms. Walker's Arbitration Provision

For all purposes relevant to CashCall's motion to compel arbitration, the arbitration provision in Ms. Walker's loan agreement is identical to that found in the loan agreements at issue in *Jackson*:

> **Agreement to Arbitrate.** You agree that any Dispute, except as provided below, will be resolved by Arbitration, which shall be conducted by the [Tribe] by an authorized representative in accordance with its consumer dispute rules and the terms of this Agreement.

(ECF No. 12-1 at 16.) Two paragraphs later, in a paragraph entitled "Choice of Arbitrator," the agreement states that "Arbitration shall be conducted in the [Tribe] by a panel of three Tribal Elders and shall be conducted in accordance with the [Tribe's] consumer rules and the terms of this Agreement." (ECF No. 12-1 at 16.) In finding an identical arbitration provision unreasonable and unenforceable, the *Jackson* court relied upon the fact that no such forum exists: the "Tribe does not authorize Arbitration, it does not involve itself in the hiring of arbitrators, and it does not have consumer dispute rules." *Jackson*, 764 F.3d at 777 (quotation, ellipses, and brackets omitted). As

such, the court had "no hesitation concluding that an illusory forum is unreasonable." *Id.* (citing *M/S Bremen*, 407 U.S. at 10).

CashCall acknowledges that the arbitral forum and associated procedural rules set forth in Ms. Walker's loan agreement are not available. (ECF No. 12 at 12.) Nevertheless, it argues, again for preservation purposes only, that the Seventh Circuit Court of Appeals got it wrong in *Jackson* and that this court should compel arbitration of Ms. Walker's claims. However, it concedes that, given the holding in *Jackson*, this court cannot enforce the arbitration clause in Ms. Walker's loan agreement. The court agrees.

### 2. Mr. Williams's Arbitration Provision

The paragraph entitled "Agreement to Arbitrate" in Mr. Williams's loan agreement is identical to that in Ms. Walker's loan agreement (and to those at issue in *Jackson*). It states:

> You agree that any Dispute…will be resolved by Arbitration, which *shall* be conducted by the [Tribe] by an authorized representative in accordance with its consumer dispute rules and the terms of this Agreement.

(ECF No. 12-1 at 9 (Emphasis added).) The material difference comes two paragraphs later, when, unlike the language in Ms. Walker's loan agreement, Mr. Williams's loan agreement states in a paragraph entitled "Choice of Arbitrator":

> Regardless of who demands arbitration, you shall have the right to select any of the following arbitration organizations to administer the arbitration: the American Arbitration Association…; JAMS…; or an arbitration organization agreed upon by you and the other parties to the Dispute. The arbitration will be governed by the chosen arbitration organization's rules and procedures applicable to consumer disputes, to

> the extent that those rules and procedures do not contradict either the law
> of the…Tribe or the express terms of this Agreement to Arbitrate….

(ECF No. 12-1 at 9.) At least one court has described this new language as creating a "conundrum." *See Heldt v. Payday Financial, LLC*, 12 F.Supp.3d 1170, 1190-91 (D.S.D. 2014). Absent any information that any "authorized representative" of the Tribe is an arbitrator in the AAA or JAMS systems, the *Heldt* court found that the two provisions are inconsistent in terms of who the parties agreed should arbitrate their disputes. *Id.*

However, another court read the two paragraphs as providing the parties with the option of choosing either (a) an authorized representative of the Tribe applying the Tribe's consumer dispute rules or (b) an arbitrator appointed by the AAA, JAMS, or other acceptable organization, applying the chosen organization's rules and procedures. In *Hayes v. Delbert Servs. Corp.*, No. 3:14-CV-258, 2015 WL 269483, at *4 (E.D. Va. Jan. 21, 2015), the court found that, as a result of the new language in the "Choice of Arbitrator" paragraph, the parties are no longer "limited to the illusory 'authorized representatives' of the [Tribe] and its non-existent 'consumer dispute rules'"; by providing the parties with recourse to "well-recognized arbitration organizations and their procedures," the new language "saves the arbitration agreement from meeting the same fate as" that in *Jackson. Id.*

In reaching that conclusion, the court in *Hayes* essentially read the language stating that the parties have the right to have the arbitration *administered* by an organization like the AAA or JAMS as if it said that they had the right to have the

9

arbitration *conducted* by an arbitrator from either the AAA or JAMS systems—even if that person were not an authorized representative of the Tribe. But the contract does not say that, at least not clearly.

Providing that an organization like the AAA or JAMS will administer an arbitration is not necessarily the same as providing that an arbitrator from that organization will conduct the arbitration. Organizations that administer arbitration "oversee[] and manage[] the arbitration from inception through final award. Such administration usually involves activities such as screening communications with the arbitrator, scheduling hearings, arranging for the filing and service of briefs and other documents, and collecting arbitrator compensation." ALAN S. GUTTERMAN, BUSINESS TRANSACTIONS SOLUTIONS § 101:39 (2015); *see also* Glen H. Spencer, *Administered vs. Non-Administered Arbitration*, DISP. RESOL. J., Feb. 1999, at 42, 43. Conversely, arbitrations are "conducted" by the arbitrators themselves—not the administering organization. *See* Rule 7, JAMS Comprehensive Arbitration Rules & Procedures, effective July 1, 2014, *available at* http://www.jamsadr.com/rules-comprehensive-arbitration/; Rule 32, AAA Consumer Arbitration Rules, Amended Sept. 1, 2014, a*vailable at* https://www.adr.org/aaa/faces/rules/.

One could read Mr. Williams's arbitration clause as requiring that the arbitrator be an authorized Tribal representative, who would interpret the loan agreement and resolve the dispute, with the selected arbitration organization providing administrative

support and the governing rules. *See Inetianbor v. CashCall, Inc.*, 768 F.3d 1346, 1350-51 (11th Cir. 2014) ("We can think of no other reasonable interpretation of the provision for arbitration 'by' the Tribe before an 'authorized representative' of the Tribe than one requiring some direct participation by the Tribe itself."). But it does not appear that the Tribe could or would be able to provide an authorized representative. The court in *Jackson* stated that the Tribe "does not authorize arbitration" and "does not involve itself in the hiring of…arbitrators." 765 F.3d at 776. "Although the arbitration provision contemplates the involvement and supervision of the…Tribe, the record establishes that the Tribe does not undertake such activity." *Id.* at 780. Thus, a proceeding subject to Tribal oversight is "simply not a possibility." *Id.* at 779. CashCall does not dispute these conclusions, acknowledging here that a Tribal arbitral forum is not available. (ECF No. 12 at 12.)

Having said that, the parties clearly agreed to resolve their disputes by arbitration, and under the FAA and as emphasized in *Green v. U.S. Cash Advance Illinois, LLC*, 724 F.3d 787 (7th Cir. 2013), that matters. It could be argued that, notwithstanding inartful drafting, the parties *did* intend that they would have the option of choosing an arbitrator selected from the AAA or JAMS systems as an alternative to choosing an authorized representative from the Tribe. After all, that language is found in a portion of the agreement entitled "Choice of Arbitrator." (ECF No. 12-1 at 9.) Even if that was not a reasonable reading of the contract, Section 5 of the FAA provides that, if for "any"

11

reason there is a "lapse in the naming of an arbitrator," the court shall appoint an arbitrator. 9 U.S.C. § 5. In other words, "Congress…provided that a judge can appoint an arbitrator when for 'any' reason something has gone wrong." *Green*, 724 F.3d at 791 (citing *Hall Street Associates, L.L.C. v. Mattel, Inc.*, 552 U.S. 576 (2008)).

So why didn't the court appoint an arbitrator in *Jackson*? The court there held that the arbitration provision (like the one signed by Ms. Walker) was void "because it provides that a decision is to be made under a process that is a sham from stem to stern." 764 F.3d at 779. Not only was there no authorized representative of the Tribe to preside over the proceeding, "the Tribe has *no rules* for the conduct of the procedure." *Id.* (emphasis in original). By providing the option of using the consumer dispute rules of the AAA or JAMS, Mr. Williams's contract solves that problem. And by allowing the parties to use an arbitrator from either the AAA or JAMS systems, the bias concerns that the *Jackson* court had about using a Tribal member as the arbitrator, *id.* at 779-80, are eliminated.

Mr. Williams's only argument as to why the arbitration provision is unenforceable is that it calls for the arbitrator to apply Tribal law, which he contends is law that does not exist. (ECF No. 16 at 9.) But that is not true, as evidenced by substantive Tribal law on contract disputes, including contract cases in the Tribe's courts, and the Tribe's Commercial Code, Rules of Civil Procedure, Constitution and By-Laws, and Law & Code. (ECF Nos. 12-4, 12-5, 12-6, 12-7, 12-8, 21.) Mr. Williams does

not raise any of the procedural or substantive unconscionability concerns expressed by the court in *Jackson*.

The most reasonable reading of Mr. Williams's loan agreement is that he has the option of choosing to arbitrate any claims that he has relating to his agreement before the AAA, JAMS, or another mutually acceptable organization, applying the consumer dispute rules of the selected administering organization and conducted by an arbitrator from the selected organization's system. Therefore, unlike Ms. Walker, Mr. Williams is required to pursue his claims against CashCall in arbitration. His complaint shall be dismissed.

## II.   MOTION FOR SUMMARY JUDGMENT

CashCall initially moved to dismiss plaintiffs' complaint under Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief can be granted. (ECF No. 3.) However, in support of its motion CashCall submitted materials outside of the pleadings, including an affidavit from a Western Sky employee, to bolster certain factual statements set forth in its supporting brief. (ECF No. 4-1 at 2-3.) Pursuant to Fed. R. Civ. P. 12(d), the court converted CashCall's motion to one for summary judgment and provided the parties additional time to file supplementary materials outside of the pleadings. (ECF No. 26.) After each plaintiff submitted an affidavit (ECF Nos. 30-31) and requested leave to conduct discovery, CashCall offered to withdraw its affidavit. (ECF No. 35 at 2.) Although the court finds that discovery is not necessary, it believes

that it would be inappropriate (and ultimately inefficient) to disregard the facts set forth in the materials submitted by the parties. Consequently, CashCall's motion will remain a motion for summary judgment.[2]

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" only if it "might affect the outcome of the suit" and a dispute is "genuine" only if a reasonable finder of fact could accept the non-moving party's position and return a verdict in its favor. *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986). In resolving a motion for summary judgment, the court is to "construe all evidence and draw all reasonable inferences from that evidence in" favor of the non-movant. *E.Y. v. United States*, 758 F.3d 861, 863 (7th Cir. 2014) (citing *Gil v. Reed*, 535 F.3d 551, 556 (7th Cir. 2008); *Del Raso v. United States*, 244 F.3d 567, 570 (7th Cir. 2001)). The "court may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder." *Washington v. Haupert*, 481 F.3d 543, 550 (7th Cir. 2007) (quoting *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003)). "To survive summary judgment, the nonmovant must produce sufficient admissible evidence, taken in the light most favorable to it, to return a jury verdict in its favor." *Fleishman v. Cont'l Cas. Co.*, 698 F.3d

---

[2] Given the court's ruling compelling Mr. Williams to pursue his claims in arbitration, CashCall's motion to dismiss his claim will have to be addressed by the arbitrator.

598, 603 (7th Cir. 2012) (quoting *Berry v. Chi. Transit Auth.*, 618 F.3d 688, 690-91 (7th Cir. 2010)).

CashCall argues that the Dormant Commerce Clause precludes the application of Wisconsin law to Ms. Walker's loan agreement. Article I of the U.S. Constitution grants Congress the authority to "to regulate commerce…among the several states." U.S. Const. Art. I, sec. 8, cl. 3. The United States Supreme Court has held that, by granting to Congress the authority to regulate interstate commerce, the Constitution implicitly limits states from regulating commerce outside of their borders. *Healy v. Beer Institute*, 491 U.S. 324, 336 (1989). "Th[e] 'negative' aspect of the Commerce Clause is often referred to as the 'Dormant Commerce Clause' and is invoked to invalidate overreaching provisions of state regulation of commerce." *Alliant Energy Corp. v. Bie*, 330 F.3d 904, 911 (7th Cir. 2003). The Dormant "Commerce Clause…precludes the application of a state statute to commerce that takes place wholly outside of the State's borders, whether or not the commerce has effects within the State." *Healy*, 491 U.S. at 336 (quoting *Edgar v. MITE Corp.*, 457 U.S. 624, 642-43 (1982)).

Relying primarily on *Midwest Title Loans v. Mills*, 593 F.3d 660 (7th Cir. 2010), CashCall argues that when a contract is formed outside of a state's borders it is beyond the state's regulatory authority. CashCall alleges that Ms. Walker's loan agreement was formed on the Tribe's Reservation. In support, it points to language in the loan agreement that states "you hereby expressly agree that this Agreement is executed and

performed solely within the exterior boundaries of the [Tribe's] Reservation…and that your execution of this Agreement is made as if you were physically present within the exterior boundaries of the [Tribe's] Reservation." (ECF No. 12-1 at 15.) It further cites an affidavit from a Western Sky employee, who asserted that "[t]he critical final steps to accept loan agreements and fund loans all occurred on the Reservation." (ECF No. 12-1 at 3.) As such, CashCall argues that it would violate the Dormant Commerce Clause to apply Wisconsin's usury statute to the loan agreement. (ECF No. 12 at 13-18.)

In *Midwest Title*, an Indiana law required creditors who advertised or solicited in Indiana to obtain an Indiana license. 593 F.3d at 662. An Illinois lender sued to enjoin the application of Indiana's law to loan agreements formed in Illinois. *Id.* Although the defendant lender advertised in Indiana, Indiana borrowers traveled to the lender's Illinois offices to obtain a loan. *Id.* at 662. The borrowers negotiated the loan agreement in Illinois, read and signed the loan agreement in Illinois, received a check in Illinois drawn from an Illinois bank, and in turn could immediately cash their checks in Illinois. *Id.* at 662-69. The borrowers also conditionally transferred collateral (title to their automobiles) in Illinois. *Id.*

Unlike the situation in *Midwest Title,* and notwithstanding the above-quoted contractual language on which CashCall relies, it is not clear that Ms. Walker's loan agreement was consummated on the Tribe's Reservation. *See W. Sky Fin. V. Maryland Com'r of Fin. Regulation*, No. CIV. WDQ-11-1256, 2012 WL 1284407, at *4 (D. Md. Apr. 9,

2012) (holding that it was not an undisputed fact where Western Sky's loan agreement was consummated). Ms. Walker states that she did not travel to the Tribe's reservation to enter into the loan agreement. (ECF No. 31.) She was physically present in Wisconsin both when Western Sky made the offer to her and when she accepted it. (ECF No. 31.) Further, Western Sky wired the money to her in Wisconsin, and she has made payments from Wisconsin. (EFC No. 31.)

Moreover, even though CashCall argues that "[t]he critical final steps to accept loan agreements and fund loans all occurred on the Reservation" (ECF No. 12-1, ¶5), it appears on the face of the loan agreement that it did not become effective until Ms. Walker noted her compliance with its terms by checking (electronically) two boxes on its final page. By checking the second box, she acknowledged that she has "read all of the terms and conditions of this promissory note and disclosure statement and agree[s] to be bound thereto. You understand and agree that your execution of this note shall have the same legal force and effect as a paper contract." (ECF No. 12-1 at 18).

The court cannot conclude at this stage that there are no genuine issues of material fact showing that CashCall is entitled to judgment as a matter of law. CashCall's motion for summary judgment as to Ms. Walker's complaint is denied.

### III. MOTION TO STAY MS. WALKER'S CLAIMS

CashCall asks this court to stay Ms. Walker's lawsuit pending the conclusion of Mr. Williams's arbitration and gives three reasons for its request. First, it argues that,

since both Ms. Walker's and Mr. Williams's substantive claims are identical, allowing her lawsuit to proceed at the same time Mr. Williams is pursuing his claims in arbitration "would result in an unnecessary waste of this Court's time and the parties' resources." (EFC No. 12 at 11.) Second, it argues that resolution of Mr. Williams's arbitration "may influence the outcome of proceedings in this case." (ECF No. 12 at 11.) Lastly, it argues that "it is likely that the outcome of an arbitration would inform the parties' decision on whether to proceed in this case." (ECF No. 12 at 11.) Ms. Walker opposes the request, noting only that the decision of the arbitrator in Mr. Williams's case would not be binding on this court. (ECF No. 16 at 9-10.)

District courts have broad discretion in determining whether to stay proceedings. *Clinton v. Jones*, 520 U.S. 681, 706 (1997). "[T]he power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants." *Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936). In determining whether to stay a proceeding the following three factors are considered: "(1) whether litigation is at an early stage; (2) whether a stay will simplify the issues in question and trial of the case; and (3) whether a stay would unduly prejudice or present a clear tactical disadvantage to the nonmoving party." *Seaquist Closures LLC v. Rexam Plastics*, No. 08C0106, 2008 WL 4691792, at *1 (E.D. Wis. Oct. 22, 2008).

Considering the three factors listed above, the court denies CashCall's request for a stay. Ms. Walker filed her lawsuit in June of 2014. As a result of the removal to this court and subsequent motions, it is now nearly nine months later. And while arbitrations oftentimes move quicker than lawsuits, that doesn't mean they move quickly. Mr. Williams's arbitration could take many months or longer. Moreover, there is no reason to believe that a stay will simplify the issues in question or streamline the trial in Ms. Walker's case. And while it's possible that the resolution of Mr. Williams's claim in arbitration could lead the parties in Ms. Walker's case to an earlier settlement than might otherwise be the case, that is not a good enough reason to prevent her from moving forward with her lawsuit now.

**IT IS THEREFORE ORDERED** that, pursuant to the findings in this Decision and Order, Defendant's Motion to Compel Arbitration as against Plaintiff Williams is **granted**.

**IT IS FURTHER ORDERED** that Defendant's Motion to Compel Arbitration as against Plaintiff Walker is **denied**.

**IT IS FURTHER ORDERED** that Defendant's Motion for Summary Judgment is **denied**.

**IT IS FURTHER ORDERED** that Defendant's Motion to Stay Plaintiff Walker's proceedings is **denied**.

Dated at Milwaukee, Wisconsin this 17th day of March, 2015.

                                                    */s/ William E. Duffin*
                                                    WILLIAM E. DUFFIN
                                                    U.S. Magistrate Judge